**AGRICHEM, INC., Plaintiff,**

v.

**LOVELAND INDUSTRIES, INC., Defendant.**

**Civ. No. 4–92–57.**

United States District Court, D. Minnesota, Fourth Division.

Feb. 2, 1994.

---

Frederick E. Finch, Bassford Heckt Lockhart Truesdell & Briggs, Robert William Gutenkauf, Burd Bartz & Gutenkauf, Minneapolis, MN, for plaintiff.

Robert A. Schroeder, Edward G. Poplawski, Steven J. Kirschner, Pretty Schroeder Brueggemann Clark, Los Angeles, CA, Wayne Anthony Sivertson, Vytas Matthew Rimas, David Richard Fairbairn, Thomas J. Stueber, Kinney & Lange, Minneapolis, MN, for defendant.

## ORDER

DOTY, District Judge.

This matter is before the court on the motion of defendant Loveland Industries, Inc. ("Loveland") for summary judgment on

the invalidity of U.S. Patent Numbers 4,898,-092 (" '092 patent") and 4,994,286 (" '286 patent"), which are owned by plaintiff Agri-Chem, Inc. ("AgriChem"). Based on a review of the file, record and proceedings herein, and for the reasons stated below, the court grants Loveland's motion for summary judgment and denies its request for an award of attorney's fees and costs.

## BACKGROUND

This case concerns the alleged infringement of two patents which describe an automated system used to moisturize livestock grain. AgriChem is the assignee of the '092 patent, entitled Feed Grain Conditioning Apparatus, and the '286 patent, entitled Grain Conditioning Method. The patents claim an automated system that conditions livestock grain at a feedlot by raising the moisture content of incoming feed grain to a target moisture content to make feed grain more palatable to animals. The claimed system may also be used to accelerate germination of seed grain.

David Greer ("Greer") is the named inventor of both inventions. Greer has been involved in the sale of additives for feed grains since the early 1970s. Greer is the president and majority shareholder of AgriChem. Greer filed a patent application for the '092 patent on May 9, 1988, and a patent was issued on February 6, 1990. The '092 patent describes the conditioning apparatus. Agri-Chem, as Greer's assignee, filed a patent application for the '286 patent on January 5, 1990, and a patent was issued on February 19, 1991. The '286 patent describes the conditioning method.

AgriChem filed suit on January 21, 1992, alleging that Loveland infringed claims 1 and 14 and the claims dependent upon them of the '092 patent, as amended, and claim 9 of the '286 patent. Loveland seeks summary judgment on the issue of patent invalidity, contending that the system claimed in the patents was invented and in use before the patent applications were filed. Loveland asserts that the APAC III Feedforward Control Systems developed and manufactured by

Agridustrial Electronics, Inc. ("Agridustrial") in the early 1970s invalidates the patents.[1]

## DISCUSSION

The court applies the same summary judgment standard to motions involving patent claims as it does to motions involving other types of claims. *See Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1561 (Fed.Cir.1988) ("It is no longer debatable that the issues in a patent case are subject to summary judgment."). The movant has the burden of establishing entitlement to summary disposition, with due considerations to the presumptions and burdens that characterize the issues in dispute. *Quad Envtl. Technologies Corp. v. Union Sanitary District,* 946 F.2d 870, 872 (Fed. Cir.1991). When the issue is patent invalidity, the movant must overcome the statutory presumption of validity by clear and convincing evidence based on undisputed facts. *Id.*

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard mirrors the standard for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), which requires the trial court to enter judgment as a matter of law if there can be but one reasonable conclusion as to the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510.

On a motion for summary judgment, the court views the evidence in favor of the nonmoving party and gives that party the benefit of all justifiable inferences that can be drawn in its favor. *Id.* at 250, 106 S.Ct. at 2511. The nonmoving party, however, cannot rest upon mere denials or allegations in the pleadings. Nor may the nonmoving party simply argue facts supporting its claim will be developed later or at trial. Rather the nonmoving

1. "APAC" is an acronym for "All Process Automatic Control."

party must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If reasonable minds could differ as to the import of the evidence, judgment as a matter of law should not be granted. *See Anderson,* 477 U.S. at 250–51, 106 S.Ct. at 2511–12. If a plaintiff fails to support an essential element of a claim, however, summary judgment must issue because a complete failure of proof regarding an essential element renders all other facts immaterial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### 1. The Claimed Invention

■ The patents describe a system which conditions grain on-line by continuously monitoring the moisture content of passing grain and adding water or water mixed with an additive in regulated amounts to achieve a target moisture content. The grain moves continuously downstream from a sensing station to a wetting station. The system uses a continuous flow moisture sensor to sample the moisture content of passing grain upstream of the wetting station. The moisture sensor generates an electronic signal based on the moisture content of the grain. The electrical signal controls an automatic valve that regulates the flow rate of the water added to the grain.

The patented system also includes a supply means to supply liquid additive for mixture with the water applied to the grain. The supply means consist of an additive pump connected to an additive supply container and an additive supply line connected between the pump and the liquid or water line. The system includes a means which regulates the amount of additive introduced through the supply line according to the volumetric flow of water. The amount of additive mixed with the water is essentially under the control of the moisture sensor which determines the volumetric flow of water.

### 2. The '092 Patent

The '092 patent describes the conditioning apparatus. AgriChem asserts that Loveland infringed claims 1 and 14 and the claims dependent upon them of the '092 patent, as amended. Claim 1 of the '092 patent as amended provides as follows:

1. A feed grain conditioning apparatus for conditioning of feed grain to bring the moisture content to an approximate target moisture content through the addition of moisture derived at least in part from a water supply, as the feed grain moves in a downstream direction from a first location toward a second location comprising: grain conveying means for moving the grain in said downstream direction, having a sensing station and a wetting station located downstream of the sensing station;

a moisture sensor of the type to continuously monitor moisture content of grain and convert the measurement into an electronic signal, positioned at the sensing station located to intercept a sample of passing feed grain for substantially continuous measurement of the moisture content of the sample and translation of the measurement into an electronic signal;

liquid applicator means located at the wetting station positioned to disperse liquid derived at least in part from a water supply upon passing feed grain;

a liquid supply line connected to the liquid applicator means and for connection to the water supply;

an automatic valve connected in the liquid supply line having an electronically actuated valve control movable between relatively open and relatively closed positions to regulate the amount of liquid flow to the liquid applicator means for application to passing feed grain;

means connecting the moisture sensor to the valve control so that the valve control operates responsive to the electronic signal generated by the moisture sensor of the grain sample as sensed by the moisture sensor and the target moisture content, said means including calibrated means connected between the moisture sensor and the automatic valve control for regulation of the valve control by the signal from the moisture sensor calibrated according to a known moisture content of the type of feed grain to be conditioned;

a supply means to supply liquid additive for mixture with the water for application to the feed grain, means connecting the additive supply means to the liquid supply line for mixture of additive and water preparatory to application to feed grain, including an additive pump connected to an additive supply container, and an additive supply line connected between the additive pump and the liquid supply line to supply an additive in regulated amounts to the liquid supply line for mixing with the water preparatory to application to the feed grain;

said wetting station including a mixing chamber for transfer of grain from the sensing station past the wetting station, said liquid applicator means communicating with the mixing chamber, means for moving the grain through the mixing chamber and mixing the liquid with the feed grain and moving it toward the second location;

said mixing chamber being an auger housing, and said means for moving the feed grain in the auger housing comprising an auger.

'092 patent, col. 1, lines 27–68 & col. 2, lines 1–21. Claims 8 and 9 of the '092 patent are dependent on claim 1. Those claims provide as follows:

8. The feed grain conditioning apparatus of claim 1 including: means sensing the volumetric flow of water from the water supply connected the additive pump control to regulate the flow of additive according to the volumetric flow of water.

9. The feed grain conditioning apparatus of claim 1 including: means sensing the volumetric flow rate of water from the water supply means connected to the additive pump control to regulate the flow of additive according to the volumetric flow of water.

The '092 patent, col. 2, lines 22–31. Claim 14 of the '092 patent recites as follows:

A feed grain conditioning apparatus for conditioning of feed grain through the addition of moisture derived at least in part from a water supply as the feed grain moves on grain conveying means from an upstream location to a downstream location in order to bring the moisture content of the grain to an approximate uniform target moisture content, comprising:

a moisture sensor adapted to continuously measure moisture content of a passing grain and translate the measurement into an electronic signal, and means for positioning the moisture sensor with respect to the grain conveying means to intercept a sample of passing feed grain and measure the moisture content of it;

a liquid applicator, means for positioning the liquid applicator downstream of the moisture sensor in a location to apply liquid to passing feed grain;

a liquid line connected to the liquid applicator at one end and connectable to a water supply;

automatic valve means interposed in the liquid line to regulate the flow of liquid through the liquid line to the liquid applicator, said valve means having electronic control means to move the valve means between relatively open and relatively closed positions to regulate liquid flow;

said control means being electronically connected to the moisture sensor signal output for control by the electronic signal of the moisture sensor generated by feed grain moisture content measurement, said connection including calibrated means connected between the moisture sensor and the control means of the valve means for adjustment of the valve means by the signal generated from the moisture sensor calibrated according to a known moisture content of the type of feed grain to be conditioned;

a mixing chamber for mixing feed grain with moisture, said mixing chamber positioned for receipt of feed grain at a location downstream of the moisture sensor, said liquid applicator connected to the mixing chamber for application of liquid to feed grain located therein;

said mixing chamber comprised as an auger housing, and including auger means located in the auger housing in position to move grain in the downstream direction

while mixing the feed grain and liquid from the liquid applicator;

a supply container for liquid additive for mixture with the water for application to the feed grain, means connecting the additive supply container to the liquid supply line for mixture of the additive and the water preparatory to application to the feed grain, including an additive pump connected to the additive supply container, said means connecting the additive supply to the liquid supply line comprising an additive supply line connected between the additive pump and the liquid supply line to supply additive in regulated amounts to the liquid supply line for mixing with the water preparatory to application to the feed grain.

'092 patent, col. 2, lines 32–68, col. 3, lines 1–15 & col. 4, lines 1–6. Claim 20 of the '092 patent is dependent on claim 14 and provides as follows:

20. The feed grain conditioning apparatus of claim 14 including: means associated with the additive pump to regulate the amount of additive pumped through the additive supply line according to the volumetric flow of water through the liquid supply line.

'092 patent, col. 4, lines 10–14.

While this case was pending, AgriChem filed a request for reexamination of the '092 patent as amended. AgriChem submitted several publications to the Patent Office which Loveland relies on to challenge the patents. The Patent Office agreed to reexamine the '092 patent in light of the newly provided prior art. The prior art before the Patent Office on reexamination included: (1) a brochure and manual entitled "Continuous Flow Moisture Monitors," dated September 16, 1982; (2) an Agridustrial brochure entitled "Process Automation Systems," dated June 1, 1983; (3) an Agridustrial brochure entitled "APAC III Delivers Optimum Moisture Control," date unknown; and (4) the "APAC III Feedforward Controller Operator's Manual," date unknown.

After examining the publications, the Patent Office upheld the validity of the amended '092 patent, concluding that claims 1 and 14, as well as the claims dependent upon them, avoid the prior patents and printed publications. The Patent Examiner stated that:

Claims 1 and 14 recite a supply means to supply liquid additive for mixture with the water for application to the feed grain, means connecting the additive supply means to the liquid supply line for mixture of additive and water preparatory to application to feed grain, including an additive pump connected to an additive supply container, and an additive supply line connected between the additive pump and the liquid supply line to supply an additive in regulated amounts to the liquid supply line for mixing with the water preparatory to application to the feed grain. This structure is not shown nor taught in the prior art.

However, the Patent Examiner was not able to consider the sworn testimony concerning prior art devices which Loveland has submitted in support of its summary judgment motion.

**3. The '286 Patent**

The '286 patent describes the conditioning method. AgriChem asserts that Loveland infringed claim 9 of the '286 patent. Claim 9 of the '286 patent provides as follows:

A method of conditioning a type of feed grain as it is moved from an upstream location along a path toward a downstream location, through regulated addition of moisture derived at least in part from a water supply, in order to increase the moisture content of the feed grain to bring it to an approximate target moisture content, comprising the steps of:

providing a moisture sensor specifically calibrated to measure moisture content of the type of feed grain to be conditioned;

measuring the content of a sample of the moving grain at a first station on the path of travel of the grain, using the moisture sensor to substantially continuously monitor the moisture content of moving grain and translate the measurement into a substantially continuously generated electronic signal;

providing liquid to the liquid applicator apparatus through a liquid line extended from a water supply;

providing an automatic valve in the liquid line of the type having an electronic valve control for regulating the opening and closing of the valve to regulate water flow through the valve by an electronic signal;

controlling the valve control of the automatic valve with the electronic signal generated by the moisture sensor to modulate the flow of water to the liquid applicator apparatus according to the moisture content of the grain sample sensed by the moisture sensor;

introducing a liquid additive into the liquid supply line in an amount according to the volumetric flow of water in the liquid supply line;

providing an auger assembly of the type having an auger housing and an auger located in the auger housing for movement of the grain from the first location toward the second location, and applying moisture to the passing grain at a second station located on the auger housing.

'286 patent, col. 12, lines 65–68, col. 13, lines 1–22 & col. 14, lines 1–18.

### 4. Validity of the Patents

■ All patents are presumed valid. 35 U.S.C. § 282. The party asserting invalidity must overcome the statutory presumption by clear and convincing evidence establishing facts which support the conclusion of invalidity. *Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 834 (Fed.Cir.1991). To be clear and convincing, the evidence must produce a firm belief or conviction that the matter sought to be established is highly probable and free from serious doubt. Loveland contends that the '092 patent and the '286 patent are invalid because the claimed invention was either anticipated under 35 U.S.C. § 102 or obvious under 35 U.S.C. § 103.

### A. Prior Art Not Considered by the Patent Office

The court has considered the prior art cited by the Patent Office as noted in the patents. Loveland challenges the validity of the patents based on prior art not considered by the Patent Office during the prosecution of the patents and the reexamination of the '092 patent. Loveland contends that the APAC III system meets each and every limitation found in the patent claims. Based on the sworn declarations of several electrical engineers, Loveland asserts that "there are no features, either of structure or function, of any significance with respect to the conditioning of feed or food grain in the ['092 and '286 patent claims] that were not either included in the APAC III systems that were marketed during the mid–1970s or known to [those] involved in the engineering and marketing of these systems."

Loveland relies foremost on the sworn declaration of Roy E. Resh ("Resh"). Resh is an electrical engineer with more than 30 years experience in applied electronic technology. In 1970, Resh co-founded Agridustrial Electronics, Inc. ("Agridustrial"). Agridustrial manufactured grain processing equipment, including continuous moisture monitoring and control systems for tempering and conditioning feed and other grain. Agridustrial developed the APAC III system in the early 1970s.

The APAC III system included a moisture sensing device and continuous moisture sensing means. The moisture sensor was calibrated to measure the moisture content of the type of grain to be conditioned. The APAC III system generally included a user operated calibration control; a factory calibrated moisture content sensor was available as an option. The moisture sensor generated an electric signal which controlled an automatic valve that regulated the amount of water added to the grain. The moisture sensor was located at a first station and an apparatus applying water was located downstream at a second station. The continuous moisture monitoring features of the APAC III system are supported by the brochures and drawings submitted by Loveland.

Resh also asserts that the APAC III system conditioned feed grain by introducing a liquid additive into the liquid supply line in an amount based on the volumetric flow of water through the liquid supply line. Resh claims that the APAC III system used a

supply means to supply an additive to be mixed into the water applied to the grain. According to Resh, the conditioning apparatus of the APAC III system commonly included an additive pump and an additive supply line which provided regulated amounts of additive to the water applied to the grain. Finally, Resh asserts that certain APAC III systems used a sensing means to sense the volumetric flow of water to regulate the flow of the additive. Although Resh attributes these features to the APAC III system, they are not corroborated by physical or documentary evidence.

Loveland also offers the sworn declaration of Don E. Kelpe ("Kelpe"). Kelpe is an electrical engineer with almost 30 years experience in applied electrical and electronic engineering technology. Kelpe has been an electrical engineer with ConAgra Flour Milling ("ConAgra") since 1971.[2] ConAgra purchased APAC III systems manufactured by Agridustrial in the mid–1970s. The systems purchased by ConAgra were continuous process systems used in flour mills and geared to condition wheat.

Kelpe claims that the systems used by ConAgra employed liquid chlorine as an additive and were equipped with a chlorine additive pump at one time or another. Kelpe asserts that an additive supply tank containing highly chlorinated water was in fluid communication with the water supply and a pump was positioned to dispense a regulated amount of chlorine additive into the water relative to the volume of water added to the grain. The volume of moisturizing water was controlled by the electric signal generated by a moisture sensor. Thus, according to Kelpe, an appropriate amount of chlorinated water additive was pumped into the water based on the volumetric flow of water. Kelpe was personally involved in installing APAC III systems equipped with chlorine pumps at two ConAgra facilities in Omaha, Nebraska. Moreover, Kelpe submitted a schematic diagram of the APAC III systems used by ConAgra which he states was drafted in 1975. The diagram depicts the feature he describes; namely a chlorine additive tank and pump and means for delivering the chlorine according to the volumetric flow of water.

Finally, Loveland submits the sworn declaration of Robert R. Boldt ("Boldt"). Boldt is an electrical and mechanical engineer with more than 30 years experience in applied electronic technology. Boldt was the director of engineering for Agridustrial from 1974–78 and was personally involved in the design of the APAC III systems. Boldt asserts that chlorine was used as an additive in a system sold to H.K. Webster Company of Lawrence, Massachusetts in 1975. The documents related to that particular system do not indicate that the chlorine was added in regulated amounts on a continuous basis.

Other than identifying the system sold to H.K. Webster Company, Boldt refers to various systems where Agridustrial installed various components according to customer needs. Boldt states that the grain conditioning additive—either propionic acid or chlorine—was dispensed into the water in the APAC III system by means of an additive pump, an additive supply container and an additive supply line. Boldt asserts that the APAC III system supplied additive in regulated amounts proportional to the volume of water mixed with the grain.

According to Boldt, supply tanks, pumps and supply lines were commonly used in the mid–1970s to introduce an additive prior to applying water for moisturizing grain. Boldt explains that the pump system and other additive related features were not emphasized in Agridustrial literature because they were so common. Boldt also states that the concept of adding water according to a sensed moisture content of grain and adding an additive conditioner in an amount proportional to the amount of water is not novel but was already practiced in the industry in the 1970s.

AgriChem submitted the declaration of William Robinson ("Robinson"). Robinson is a milling technology specialist with 15 years experience in the field of milling. He is currently employed by the North Dakota State University in the Department of Cereal Science and Food Technology. Robinson is

---

**2.** Loveland is a wholly owned subsidiary of ConAgra.

familiar with the APAC III feed forward tempering system. Robinson asserts that in his experience the APAC III was used in flour milling to control the addition of water only to grain. Robinson states that although chlorinated water was used in some APAC III systems, chlorine was not added to a moisturizing water line but was introduced separate of the APAC III system. Robinson also states that he is not aware of a feed forward tempering system being used at a feedlot for purposes of conditioning grain prior to 1988.

## B. Meaning of the Term "Additive"

AgriChem contends that the patents contemplate as part of the invention, the use of an additive mixed with the water to enhance conditioning, namely a surfactant or similar agent. Loveland concedes that the claims at issue require the use of an additive along with the water applied to the grain. Loveland asserts that the evidence clearly shows that Agridustrial sold an APAC III machine in the 1970s which added regulated amounts of a liquid chlorine mixture to the water applied to the grain. Loveland also contends that other APAC III machines added regulated amounts of propionic acid to the water before it was applied to the grain. Chlorine is used as a disinfectant and propionic acid is a mold inhibitor. AgriChem argues that chlorine and propionic acid are not "additives" as that term is used in the patents because neither are added to water to enhance conditioning. Loveland responds that the term "additive" cannot be given the limited meaning AgriChem ascribes to it.

 Claim interpretation is a question of law to be decided by the court. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 822 (Fed. Cir.1992). A dispute over a term within the claims does not generally create a fact question. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579–80 (Fed.Cir.1989); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 797 (Fed.Cir.1990). When the meaning of a term used in the claims is disputed, the court looks to the language of all the claims, the specification, the prosecution history and the prior art. *SRI International v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.

1985) (en banc); *Minnesota Mining Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1566 (Fed.Cir.1992). The court is mindful that, although the claims are interpreted in light of the specification, statements in the specification should not be read into the claims as limitations.

In the most general terms, an additive is something added to alter or improve the quality of an item. The interpretation urged by AgriChem differs from the ordinary meaning of "additive." The terms in a claim are given their ordinary meaning, however, unless it appears from the patent that they were used differently by the inventor. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387 (Fed.Cir.1992) (citation omitted). If Greer wished or intended to use a term in some particular way other than that understood by one of ordinary skill in the art at the time the patent application was filed, he must have defined it in the patents prior to issuance. Loveland argues that the patents do not indicate that the term additive denotes only a surfactant.

The term "additive" as used in the patent claims is modified only by the word "liquid." No other limitation appears on the face of the claims. The patent specifications state that the grain is intercepted "for conditioning it through the addition of water either alone or mixed with a fluid additive such as a nutrient, a surfactant or a flavoring agent." '092 patent, col. 2, lines 43–45; the '286 patent, col. 3, lines 56–58. The specifications also state that the "added moisture may be in the form of steam, hot or cold water, or a water-surfactant mixture." '092 patent, col. 2, lines 22–24; the '286 patent, col. 2, lines 60–62. Finally, the specifications indicate that processing is intended to increase the value of feed grains in terms of palatability and digestibility. '092 patent, col. 1, lines 20–23; '286 patent, col. 1, lines 30–33.

AgriChem insists that the patent uses "additive" to designate a surfactant. The court concludes that the meaning of "additive" advanced by AgriChem is not supported by the patent language. The patent language does not indicate that the term "additive" is used in an uncommon way. Although the specifi-

cations include examples of additives to be mixed with the water before it is added to the grain, there is no indication that the term "additive" was limited to the examples given or otherwise intended to have a narrow meaning. The fundamental flaw with Agri-Chem's interpretation is that the additives identified in the specifications do not meet the narrow definition it now urges the court to adopt.

AgriChem argues that the patents require the water be mixed with a surfactant or similar agent that enhances conditioning. A surfactant is a substance that, when dissolved in water, reduces the surface tension of the water and facilitates the absorption of water into the grain kernal. Adding a surfactant to water alters the absorbability characteristics of the water. The patent specifications indicate that grain may be conditioned "through the addition of water either alone or mixed with a fluid additive such as a nutrient, a surfactant or a flavoring agent." A nutrient adds nourishment and a flavoring agent imparts flavor; neither substance enhances conditioning or the absorbability of water.

■ While "the inventor may be his own lexicographer ... he must use his words consistently in the claims and in the specifications." *Burlington Industries, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1421 (Fed.Cir. 1988) (citations omitted). The court concludes that the term "additive" as used in the patents is not limited to agents that enhance conditioning. Rather, the term "additive" as used in the patents must be given its ordinary meaning. Thus, any substance which is added to alter or improve the quality of the water or grain must be considered an additive. The court agrees with Loveland that the term "additive" as used in the patents includes chlorine and propionic acid.

**C. Anticipation**

■ A patent may be invalid as anticipated due to the embodiment of the claimed invention in a prior device that was known or placed on sale. 35 U.S.C. § 102(a) & (b). Section 102 provides in pertinent part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country ... before the invention thereof by the applicant for the patent, or

(b) the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

*Id.* An on sale bar determination requires that the device asserted to have been on sale was operable, the complete invention claimed was embodied in the device offered for sale and the sale or offer was primarily for profit rather than for experimental purposes. *Keystone Retaining Wall Sys. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed.Cir.1993).

■ Whether a prior art reference anticipates a patented claim is a question of fact. *Scripps Clinic & Research Fdn. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir.1991). Anticipation is established under section 102 only when a single prior art reference discloses each and every element and limitation of the claims at issue. *Carella v. Starlight Archery and Pro Line Co.*, 804 F.2d 135, 138 (Fed.Cir.1986); *RCA Corp. v. Applied Digital Data Sys., Inc.*, 730 F.2d 1440, 1444 (Fed.Cir.1984). Every element of the invention must be literally present, arranged as in the claims. *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 894 (Fed.Cir.1984). If the prior art reference does not disclose all elements of the claim, it does not anticipate the invention.

■ Loveland contends that each and every limitation found in the patent claims is met by the APAC III grain moisturizing systems which added chlorine or propionic acid as an additive. Loveland contends that the APAC III continuously sensed the moisture content of incoming grain and adjusted the amount of water added as the grain moved through the system. AgriChem responds that Loveland has failed to identify a single device that includes each and every element of either patent at issue. AgriChem argues that the APAC III system does not anticipate the claimed invention because it lacks an additive supply, an additive pump and means for delivering additive either di-

rectly or indirectly according to the volumetric flow of water.

The APAC III systems described by Kelpe appear to disclose each limitation of the claims at issue. Kelpe was involved in installing APAC III systems equipped with chlorine pumps at two ConAgra facilities in Omaha, Nebraska. The systems included an additive supply tank containing highly chlorinated water which was in fluid communication with the water supply and an additive pump positioned to dispense a regulated amount of chlorine additive into the water relative to the volume of water added to the grain. The volume of moisturizing water was controlled by the electric signal generated by a moisture sensor; thus, a regulated amount of chlorine additive was pumped into the water line based on the volumetric flow of water. A schematic diagram submitted by Kelpe corroborates the features he describes.

Although Kelpe's declaration tends to show anticipation, the court concludes that Loveland has not by clear and convincing evidence established facts that as a matter of law show that the claimed invention was anticipated by the prior art. There are at least two reasons why Kelpe's testimony should be regarded with caution and subjected to close scrutiny. First, as a longtime employee of ConAgra, the parent company of defendant Loveland, Kelpe's credibility is subject to attack. Second, the schematic diagram submitted by Kelpe does not on its face indicate that it was drafted in 1975 or that it refers to APAC III systems installed at ConAgra facilities in Omaha, Nebraska. Accordingly, the court concludes that the question of anticipation cannot be decided as a matter of law on this record.

## D. Obviousness

█ Loveland also asserts that AgriChem's patents are invalid because the claimed inventions are obvious. A patent is invalid if the differences between the claimed invention and the prior art are such that the invention as a whole would have been obvious to a person of ordinary skill in the art at the time the invention was made. 35 U.S.C. § 103. Obviousness is a question of law based on a series of factual determinations, including (1) the scope and content of the prior art, (2) the differences between the art and the invention set forth in the claims at issue, (3) the level of ordinary skill in the art at the time of the invention. *Graham v. John Deere, Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966). The court must also consider secondary factors, such as long felt but unresolved needs, failure of others to create the claimed invention and commercial success, which may indicate that the claimed invention was not obvious. *Id.*

The court concludes that the APAC III systems described in the declarations of Resh and Boldt show that the subject matter of the claims at issue would have been obvious under § 103. The court has set forth the scope of the prior art above. The court finds that there is almost no difference between the prior art and the invention set forth in the claims at issue. Both Resh and Boldt describe in detail a grain processing system that included an additive tank and pump and means for delivering the additive according to the volumetric flow of water. AgriChem has not offered any contrary evidence; instead, AgriChem urges the court to reject the declarations as unsupported. The court finds that there is no reason to doubt the accuracy of the declarations and notes that the declarations of Resh and Boldt corroborate each other. The court has considered the relevant secondary factors, including commercial success, and concludes they fail to indicate that the claimed invention was novel. *Id.* The court holds that Loveland has by clear and convincing evidence established facts that as a matter of law show that the claimed invention would have been obvious under section 103. Accordingly, the court grants Loveland's motion for summary judgment on the issue of patent invalidity.

## 5. Attorney's Fees

The court has discretion to award reasonable attorney fees to the prevailing party in exceptional cases. 35 U.S.C. § 285. The court declines to make such an award in this case and denies Loveland's motion for attorney fees.

## CONCLUSION

Based on a review of the file, record and proceedings herein, and for the reasons stated above, IT IS HEREBY ORDERED that:

1. Defendant Loveland's motion for summary judgment on the issue of patent invalidity is granted as to United States Patent No. 4,898,092 and United States Patent No. 4,994,286.

2. Defendant Loveland's motion for attorney fees is denied.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**